Filed 6/17/13  P. v. Settle CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>JOHNATHAN WILLARD SETTLE,<br><br>        Defendant and Appellant. | F062174<br><br>(Super. Ct. No. F06909017)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  W. Kent Hamlin, Judge.

John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Charles A. French, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Johnathan Willard Settle strangled and killed his 62-year-old great-aunt, Rita Cordrey, about 11 days after he was released from prison. He appeals from his first degree murder conviction, contending (1) defense counsel was ineffective for failing to object to inadmissible and prejudicial evidence, (2) the trial court abused its discretion by denying defendant's motion to discharge a juror, and (3) the abstract of judgment must be corrected to reflect the credits to which defendant is entitled. We will direct the trial court to amend the abstract of judgment to reflect the proper credits and affirm the judgment as so modified.

## PROCEDURAL SUMMARY

On September 14, 2007, the Fresno County District Attorney charged defendant with murder (Pen. Code, § 187, subd. (a)).[1] The information further alleged that defendant personally used a deadly or dangerous weapon within the meaning of section 12022, subdivision (b)(1) and that the murder was committed intentionally and involved the infliction of torture pursuant to section 190.2, subdivision (a)(18).

A jury found defendant guilty of first degree murder and found the deadly weapon allegation true, but the torture allegation not true.

The trial court sentenced defendant to 25 years to life on the murder count, plus a one-year term on the deadly weapon enhancement.

## FACTS

*August 25, 2006[2] — Defendant's Return Home from Prison*

On about August 25, when defendant was 24 years old, he got out of prison and came home to live with his mother, Jovonne, in an apartment on Willow Avenue. Jovonne was Rita's niece. Jovonne testified that when defendant came home, he was overly affectionate with her. He wanted to hug and cuddle a lot. He would hug her and

---

[1] All statutory references are to the Penal Code unless otherwise noted.

[2] All subsequent dates refer to 2006 unless otherwise noted.

tell her it was "hom[ie] love," an expression she had never heard. Once, he hugged her and gave her an open kiss on the chin, which he had never done before.[3] When she reacted, he just backed off. Jovonne told her mother and her sister, Delberta, about it. When Jovonne and defendant sat around the house in the evenings, he would tell her to sit up straight and cross her legs. He said, "[B]ecause they're watching us." She told him she was in her own home and she could sit as she liked. She told him he should relax, but she thought he was not "thinking right."

*September 2 — Defendant's Party*

On Saturday, September 2, Jovonne had a party for defendant at their apartment to celebrate his release from prison. Rita was among the partygoers, as was Eldon, defendant's cousin. Rita yelled at Eldon for crossing his arms during prayer, and she yelled at someone else for using a cell phone. It was common for Rita to yell at people. She was bipolar and she got angry quickly. She had a habit of getting after people. She left the party shortly after the yelling.

*September 4 — The Day Before the Murder*

On Monday, September 4, Rita came by to apologize to Eldon for yelling at him at the party.

At about 5:30 or 6:00 p.m., as one of Rita's neighbors left her apartment on Ventura Avenue, she saw defendant standing outside of Rita's apartment, leaning on the wall around the corner from her front door. The neighbor lived in the apartment across from Rita's apartment. She and Rita were friends and they had known each other about seven years. The neighbor walked directly past defendant. They made eye contact, but did not exchange words. The neighbor put her things in her trunk, but she realized she had forgotten something. So she walked directly past defendant a second and third time when she returned to her apartment to retrieve the item and then returned to her car.

---

[3] She denied that he bit her; he did not use his teeth.

3.

Defendant did not move, but he held his head down now. He was wearing a T-shirt, jeans, and white tennis shoes.

Around 8:30 or 9:00 p.m., Jovonne picked defendant up from work at his uncle's vineyard and brought him home. After Jovonne showered, she came downstairs and saw defendant sitting on the couch and watching television. He was holding a knife and flicking it. The knife was a regular pocket knife with two or three blades in it. It was not a switchblade.[4] Jovonne thought it looked like a Boy Scout knife. The flicking irritated her and she was not sure if he was allowed to possess the knife while on parole. She told him to stop and he said okay. She asked him where he got the knife. He told her he got it from his cousin at the vineyards for cutting the raisins. He said he needed a knife to do the job. She told him to put it away and he agreed. She said, "I don't even know if you're supposed to have a knife like that in the house." She told him to put it away or she would take it. He said, "I paid money for the knife, and I'll put it away." She said, "[J]ust give me the knife. I'll put it in my room and tomorrow, when you go work with your uncle, you can have it back." He said, "No, you'll throw it away." He walked quickly upstairs, changed out of his pajamas and into khaki shorts, a red T-shirt, and white tennis shoes. She did not know if he was wearing a white tank top under his T-shirt. He left the house around 9:30 or 9:40 p.m. and Jovonne did not see or hear from him after that.

At about 10:45 p.m., when Rita's neighbor got home to the apartment complex, she did not see defendant outside Rita's apartment.

Around 11:30 p.m., defendant arrived at the house of Joseph, his longtime friend. He woke Joseph up. They walked to another friend's house, then came back to Joseph's house. Defendant put his knife on the couch. It was silver and had a belt clip on it. The

---

**4** This was Jovonne's testimony at trial. In her interview with Detective Frazier (see *infra*), she called it a switchblade.

4.

blade was about six inches long. He had a screwdriver on the front of his pants near the fly. He seemed normal. They talked about girls and music and were together for about an hour and one-half.

*Tuesday, Sept 5 — Rita's Murder and the Investigation*

At about 2:00 a.m., Rita's neighbor woke up when she heard Rita screaming. The screams sounded like Rita was in danger and being harmed. The neighbor heard a male voice yelling at Rita for about a minute, trying to quiet her, and the neighbor heard loud banging and rumbling noises. She was able to hear the noises easily because the building was old and the walls were thin. She was too afraid to go outside.

At about 2:30 a.m., defendant arrived at the house of his uncle, Delbert, who was Rita's brother and Eldon's father. Delbert's house on Tulare Avenue was located between Rita's apartment and Jovonne's apartment. Everyone was asleep except for Eldon, who was up playing video games. He heard knocking at the back door. He opened the door and saw defendant in a white tank top, shorts, and tennis shoes. The white tank top had a bloody handprint and other blood smears on it. There was quite a bit of blood on the tank top and it was very obvious. Eldon looked defendant over and saw scratch marks on his arms. The scratches on his upper right arm started at his shoulder and went down diagonally toward his chest. Eldon thought the blood on the tank top came from someone else, not from defendant's own scratches. Eldon asked defendant what happened, and defendant told him he had gotten in "a fight with a scrap," which Eldon took to mean a gang member. Eldon did not believe defendant because he did not look like he had been in a fight with a man, where punches are usually thrown. Defendant asked to borrow some money, and Eldon gave him five dollars, the only money he had. Defendant left after staying less than five minutes.

Eldon woke Delbert up. They had a brief conversation about defendant and they called Jovonne. Delbert did not go back to sleep.

At about 6:30 a.m., defendant returned to Delbert's house. Delbert, Eldon, and Eldon's brother were getting ready to leave in Delbert's car. Defendant was now bare-chested, and the white tank top was rolled up and draped around his neck. He was wearing yellowish-brown shorts. Delbert thought it was unusual that defendant was not wearing a shirt; he usually dressed properly. Delbert noticed the deep diagonal scratches on defendant's upper arm. Delbert asked, "[Defendant], what you doing here?" Defendant did not respond, so Delbert said, "We're gonna have to go. You want to go with us?" Defendant answered, "Yeah, I'll go." They got in Delbert's car and left. In the car, Eldon and defendant were talking about defendant's becoming a rapper or musician, when suddenly defendant asked Eldon if he said something about Rita. Eldon said, "No, I didn't say anything about Rita." Eldon thought the question seemed out of place because they had not been talking about Rita. They dropped Eldon's brother off at the bus stop, then stopped for a donut. Delbert thought defendant was acting a little nervous. They drove to the hospital to pick up Delbert's wife from work. When Eldon went into the hospital to get her, Delbert noticed that defendant was "very very nervous" in the parking lot as they waited 15 minutes. He turned side to side, as if he was looking for something.

On the way home, they drove down Iowa Street and noticed Rita's red truck parked one block north and three houses east of Delbert's house, which was unusual because Rita did not live there and when she came to visit them she would park in their driveway. Furthermore, Delbert knew Rita went to work at 6:00 a.m. and therefore her truck should have been parked at work. For Delbert, "[m]ore red flags were going up because that was unusual." He did not say anything. He tapped Eldon's knee and told him, "Shh, don't say nothing," Delbert was afraid bad things had happened. Defendant did not say anything when they saw Rita's truck.

At about 8:00 a.m., they arrived back at Delbert's house. Defendant came inside and Delbert's wife put some medication on his scratches. Defendant said, "Oh, I'm not

6.

gonna be leaving. I want to lay down here and rest for a little while." Delbert wondered why defendant was not going home. As defendant lay on the couch for about 15 minutes, Delbert called Jovonne. He told her, "[Defendant] is here again, and I'm just letting you know that Rita's truck is parked out on Iowa [Avenue], about three houses down." Before defendant left, he told Delbert, "I love you Uncle Del." This was unusual because Delbert and defendant never talked a lot. They would just say hello or give each other a familial hug. Defendant went outside to get a cigarette, then walked across the street toward Iowa Avenue. He looked back and saw Delbert watching him. He kept walking and Delbert lost sight of him.

Delbert was really concerned, so he called Jovonne again. He told her defendant had just left and Rita's truck was still there. Jovonne drove over to Rita's truck and Delbert and Eldon walked to meet her. The inside of the truck was messy, as usual, and the keys were in the ignition. Delbert told Jovonne not to drive the truck. But she thought the truck had been stolen and she did not want to leave it there for the thief. She wanted to return it to Rita, so she got in the truck and drove it to Rita's apartment complex. Delbert and Eldon walked back home and drove over to Rita's to meet Jovonne.

When Delbert arrived at Rita's apartment complex, Jovonne had already been inside Rita's apartment. She said, "Rita is cold already. Her legs were cold." They went out to the sidewalk, sat down on the planter, and called the police.

At 9:38 a.m., officers arrived at Rita's apartment in response to the call. Jovonne gave the officers the keys, directed them to Rita's apartment, and told them the doors were unlocked. The apartment had only one entrance, which was accessed from a courtyard. The door had a separate lock and deadbolt, and was covered by a metal security door. The officers found no signs of damage or forced entry at the doors or any

7.

of the windows. The apartment was cluttered, with telltale signs of a violent struggle. Items were on the floor and furniture was out of place.[5] A black purse containing Rita's bills, credit cards, driver's license, and other miscellaneous items was on the coffee table. A new cell phone and its box were on the table, and a $100 bill was under some items. Things were all over the floor.

In the doorway between the living room and the bedroom lay Rita's body. She was on her back wearing a nightgown, which was pulled up to her stomach, exposing her naked lower body. Her legs were slightly spread apart. She had a bite mark on her left cheek and dried blood matted on her hair. Her hands were bloody and bruised. A vacuum cleaner was tipped on its back side at her feet. The vacuum's cord, which was still attached to the vacuum, extended across her right leg and stomach, under her left arm, behind her neck, and to her right hand. The end of the cord was gathered up in her right hand and she appeared to be gripping it.

The lower portion of the open bedroom door, beside which Rita lay, was smeared with blood. Inside the bedroom, a nightstand was tipped over and a dresser's drawers were open. Items were on the floor in front of the open drawers. Damaged eyeglasses were on the floor. The bed was unmade and two Bibles were sitting on it. In front of the bathroom doorway was a towel, some panties, and a bloody pillow.

Detective Frazier spoke to Jovonne, Delbert, and Eldon. Delbert and Eldon told him they had contact with defendant in the early morning and he had blood and scratches on him. They felt he might be involved. Frazier directed a team of undercover officers to look for defendant.

The coroner, Dr. Chambliss, was also on the scene. He observed bruising on Rita's neck and he concluded the vacuum cleaner's cord was a possible ligature. He saw

---

**5**     Delbert testified that Rita kept her apartment cluttered, but not in this state. She did not leave things scattered all over the place and turned upside down.

no other possible ligature near Rita. Her left cheek bore an obvious bite mark surrounded by bruising, and her right cheek and nose were bruised. The tops of her hands were bruised, and there was a cluster of slit-like injuries to her left lower back area. Her hips were bruised and her legs were abraded and bruised. All of these injuries were inflicted before her death.

A technician swabbed the interior and exterior perimeters of the bite mark on Rita's face and he scraped under her fingernails for possible trace evidence. He lifted six latent finger prints from dirty dishes on the dining table, a cell phone, and the cell phone user guide. A print lifted from a glass tumbler matched defendant's thumb print.[6] The technician was unable to lift any prints from the vacuum cleaner. The print on the tumbler was the only print that matched defendant's print. A technician also swabbed Rita's truck for possible DNA.[7]

When officers went to the apartment of Rita's neighbor and asked her if she knew Rita, she broke down and cried because she realized something had happened to Rita and she regretted not helping her or calling the police when she heard her screaming.[8]

Meanwhile, undercover officers began surveillance of Jovonne's apartment complex and the surrounding area. An officer observed defendant walking through the pedestrian gate and into the complex. Defendant passed within about 10 feet of the officer. Defendant was walking nonchalantly and casually. He was wearing khaki shorts and a white T-shirt, and he had a white tank top tossed over his left shoulder. He was carrying some jeans rolled up in a ball under his right hand. Defendant did not walk

---

**6** Depending on the environmental conditions, such a print could last for months.

**7** Deoxyribonucleic acid.

**8** An officer spoke to another neighbor who said that Rita sometimes wandered the streets at night, and a couple of weeks prior to her death, she had awoken him early in the morning by knocking on his window and asking him to let her back into the complex because she did not have a key.

toward his apartment, but instead walked around to the back of the complex. The officers stopped him at gunpoint in the carport. He dropped the tank top and jeans, and complied when told to lie on the ground. He was handcuffed and taken into custody. Rolled up inside the jeans was a can of beer. A pocket in the jeans contained $40, plus some change. The white tank top was blood-stained, and one of the white tennis shoes he was wearing was smeared with blood on the outside portion of the shoe, on the laces, and on the tongue. He was not carrying a weapon. The officers transported him to headquarters.

Frazier conducted a recorded interview of Jovonne. The recording was played for the jury. Jovonne explained that when defendant got out of prison, he treated her like a woman, rather than his mother. He had a look of love in his eyes that was different than how a son would look at his mother. He also told her to sit properly and keep her legs together. She told him, "Come on. I'm your mom. You're not thinking right, you know." Then he approached her and kissed her, bit her chin, and said, "Give me a hug … this is Homie love …." She said the bite was more of a nip and not really a bite. Another time he held her tight from the back and she said, "What the hell? Let go." She told him, "You cannot … no. Huh-uh, [defendant]. You disrespected me." She told him to let her go. He said, "Ah, you just want a little, just a little Homie love."

Jovonne told Frazier she saw defendant with a knife, which she described as a switchblade. She told defendant he could not have a switchblade because it was illegal. She told him she would take the knife and give it back to him when he was off parole. She said he could not have the knife in her house. When he refused to give it to her, she threatened to call the police. He said he would leave and he did around 9:30 or 10:00 p.m.

After defendant arrived at headquarters, Frazier and Detective Tello interviewed him after reading him his *Miranda*[9] rights. The recorded interview was played for the

---

[9]     *Miranda v. Arizona* (1966) 384 U.S. 436.

10.

jury. Defendant described his knife as a regular pocketknife with a six- or seven-inch blade. When asked if the blade popped out automatically, he said, "Yeah, it just popped out." He said, "[Y]ou press the button to flip it out."[10] His mother was upset he had the knife, so he left home around 8:00 or 8:30 p.m. After he left the apartment complex, he threw his knife away. He walked down Peach Avenue to Jensen Avenue and got in a fight with a Mexican because the Mexican gave him dirty looks. The Mexican scratched defendant's arm while they were fighting. After the fight, defendant went to the recording studio of a producer named Cool D around 11:00 p.m. Defendant cleaned the Mexican's blood off his shorts and other things, then left around 3:00 or 4:00 a.m. Next, he went to Delbert's house. He did not want to go home because his mother "was trippin' off the little pocketknife [he] had." He arrived at Delbert's house around 4:00 a.m. He knocked on the back door. Eldon answered and asked what defendant was doing. He answered he was not doing anything, but he had gotten in a fight. He realized it was too early, so he left and went back to Cool D's house. He walked less than a block when he decided to return to Delbert's house instead. He arrived back there at 6:00 or 6:30 a.m. He waited around the house until he thought his mother had gone to work. He left and called his cousin, Paul, from a pay phone. At about 8:45 or 9:00 a.m., Paul picked him up at a liquor store. They went to Paul's house and listened to the radio in the back yard. "[S]ome white guy, Dave," gave him a ride back to his mother's apartment and that was when the officers stopped him.

Defendant explained that he was wearing his shorts and the tank top during the fight with the Mexican. The blood on the tank top belonged to the Mexican. He said it might appear to be Rita's blood if she and the Mexican had the same DNA. He explained that some people do have the same DNA. Defendant denied driving Rita's truck, other than in 2001. And he said, "I, I, I guarantee you guys won't find my DNA under her

---

**10**    On cross-examination, Frazier agreed that a thumb-activated knife was not illegal.

11.

fingernails. You know what I'm saying? I didn't have shit to do with that shit, you know?" When the detectives asked him what he would say if the DNA under Rita's fingernails turned out to be his, he said, "That DNA could be anyone's." And when they asked him what he would say if the blood on the tank top came back as Rita's, he said, "What if it comes back to a Mexican? How are you gonna know?" They explained to him that they would in fact know. Defendant continued to deny his involvement and eventually refused to speak further.

At about 5:20 p.m., officers drove defendant to the hospital for collection of evidence. He was seated in the hospital hallway while they waited for a nurse. No conversation occurred with defendant until he asked an officer, "How much time will I get for murder?" The officer truthfully told him she did not know, nor did she know the crimes that he was being charged with.

A registered nurse, who worked as a sexual assault forensic examiner, performed a sexual assault examination on defendant. She observed and documented his scratches and tattoos. He told her he had been in a fight the previous night. She observed no saliva, semen, or blood secretions on defendant's body, and she concluded the examination was negative for a sexual assault. She collected blood samples from defendant.

*September 6 — Examination of Rita's Body*

On September 6, Dentist Alan Benov made impressions of defendant's teeth. From the impressions, Benov made models to create models of defendant's upper and lower teeth. Benov took the models to the morgue to examine the bite marks on Rita's left cheek. The bite mark was situated so the upper teeth were toward her ear and the lower teeth were toward the angle of her mouth. There was penetration, bruising, and some abrasion from a dragging force. Either Rita was resisting and pulling away, or the bite was made in an aggressive fashion. Benov determined that defendant's models were consistent with the bite mark.

12.

The same day, Dr. Chambliss performed an autopsy on Rita's body. He determined that the cause of death was ligature strangulation. There were two parallel linear bruises across the front and sides of her neck. The upper bruise was about five and one-half inches long and the lower bruise was about nine and one-half inches long. They were about one-half inch apart. The thyroid cartilage of the larynx and the hyoid bone were fractured and some of the neck muscles had hemorrhaged. These injuries were consistent with the ligature strangulation. Rita also had bruising and at least 11 abrasions under her jaw, which could have been produced by the perpetrator's hands or by Rita's hands if she raised them to her neck area and curled them to resist the ligature. These injuries were probably caused by one or two sets of hands. The bruises and abrasions on Rita's shoulders and legs were likely inflicted during the course of a struggle. The bite mark showed tearing of the skin from a forceful pulling away of the tissue. The cluster of puncture wounds on her lower back was within a large circular bruise. They penetrated the skin and fatty tissue (an inch or more), but not the muscle or the body cavity. The wounds were consistent with having been inflicted by a knife. The instrument that produced the wounds was repeatedly inserted close to the body. The bruising indicated they were inflicted within minutes prior to death. Rita also suffered a small blunt force laceration to the top back portion of her scalp.

Dr. Chambliss saw evidence of a struggle, but death itself could have occurred quickly. The evidence suggested the strangulation process was not long.

*DNA Analysis*

Thomas Fedor, a forensic serologist who specialized in DNA analysis, worked for Serological Research Institute, a private, accredited crime lab. He performed Short Tandem Repeat (STR) analysis on the samples in this case. Fedor tested the DNA at 15 genetic regions (loci), plus a gender indicator to create a DNA profile. He compared the DNA in the samples to the DNA in reference samples of defendant's and Rita's blood.

The DNA in the blood on defendant's tank top matched Rita's DNA. And the DNA in the blood on the shoe also matched Rita's DNA (even though it also included some DNA from someone else). The frequency of the DNA profile in the blood, or the chance that someone unrelated would have that profile, was about one in 343 quintillion (343 followed by 18 zeros). The population on earth was about seven or eight billion. Further, the analysis demonstrated that the blood on defendant's shoe could not have come from either defendant or Jovonne.

A swab of the bite mark on Rita's face tested positive for amylase, a salivary enzyme. The swab contained very low levels of a mixture of DNA from more than one person. The major contributor's profile was consistent with Rita's profile, the frequency of which, as noted above, was one in 343 quintillion. The minor contributor could have been defendant, but the profile was limited and its frequency was one in 14. Because the minor contributor's profile was not very discriminating, Fedor conducted Y-chromosome (Y-STR) testing on a bite mark swab. The profile produced by this testing matched defendant's profile. Y-STR testing cannot discriminate between the members of the same paternal line, such as father and son, or brother and brother.

The scrapings from Rita's fingernails contained a mixture of DNA from more than one person. The mixture was consistent with having come from Rita and defendant. The chance that a randomly chosen man would have the same profile as defendant was about one in 99 quadrillion (99 followed by 15 zeros).

The swab of the shift lever of Rita's truck produced a limited DNA profile, so Fedor conducted Y-STR testing on it and found that the profile matched defendant's profile.

**Behavior toward Delberta**

Delberta was Jovonne's sister and defendant's aunt. At trial, she explained an incident that occurred about six years before the murder. She gave defendant a ride from an appointment and dropped him off at home. He gave her a hug and affectionately

14.

nibbled the side of her neck. She pushed him away and told him, "You don't do that." He answered, "Why? It was just a friendly kiss." She told him, "You don't kiss your aunt that way." He said, "Okay. I'm sorry." She thought his behavior was inappropriate between an aunt and a nephew. He did not kiss her like she was his aunt. But she noted that he did not bite her to break her skin. It was more like a nibble and it did not even leave a mark.

### Blood on the Tennis Shoe

At trial, Jovonne explained that the blood on defendant's shoes was her blood. Defendant's shoes had been on the bathroom floor when she was in the bathroom showering. She walked across the room to get her supplies because she was menstruating, and two drops of blood fell onto his shoes. She immediately washed the blood off with a wet washcloth.

Frazier testified that Jovonne never told him that her blood was on defendant's shoes.

The parties stipulated that if Scott Baly (defense counsel) and Ralph Torres were called as witnesses, each would testify that Jovonne never told them that her biological fluid may have come in contact with defendant's shoes, and if she had told them, they would have taken steps to follow up on that information, which they did not do.

**Defense Evidence**

An officer who documented the scene in Jovonne's apartment observed in the sink of the upstairs bathroom a light pink towel with an apparent blood stain.

## DISCUSSION

### I.     Ineffective Assistance of Counsel

Defendant contends defense counsel provided ineffective assistance by failing to object to evidence that defendant had incestuous feelings toward his mother, Jovonne, and his aunt, Delberta. Defendant says counsel should have objected to the evidence as inadmissible character evidence (Evid. Code, § 1101, subd. (a)) or as unduly prejudicial

15.

(Evid. Code, § 352).  Defendant explains that the failure was not harmless because, "despite sufficient evidence to support the verdict, because the prosecution's case for first-degree murder was not overwhelming, and because the evidence of [defendant's] incestuous actions was highly prejudicial, there was a reasonable probability that, absent the inadmissible evidence, a single juror would have voted for second-degree murder."

Evidence of a person's character is inadmissible when offered to prove his conduct on a specific occasion.  (Evid. Code, § 1101, subd. (a).)  That evidence, however, may be admitted "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident … ) other than his or her disposition to commit such an act."  (Evid. Code, § 1101, subd. (b); see *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 & fn. 1.)  "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  "Motive is always relevant in a criminal prosecution."  (*People v. Perez* (1974) 42 Cal.App.3d 760, 767.)  "Motive describes the reason a person chooses to commit a crime."  (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.)  "Motive is an intermediate fact which may be probative of such ultimate issues as intent [citation], identity [citation], or commission of the criminal act itself [citation]."  (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017-1018.)

Evidence of defendant's inappropriately romantic behavior toward his mother and aunt, and their rebuking reactions to it, was relevant to prove a possible motive for defendant's killing his own great aunt, who may have similarly rejected his sexual advances, rebuked him, or even threatened to report his behavior to others.  The condition of Rita's apartment and her many injuries demonstrated she had endured an extensive struggle before her death.  She was found on the floor with her legs separated and her nightgown lifted to expose her naked lower body.  The bite on her cheek further suggested a perversely intimate element to the brutal attack.  The evidence of defendant's

16.

prior inappropriate behavior toward the females in his family was admissible under Evidence Code section 1101, subdivision (b).

But even when evidence of prior acts is admissible under Evidence Code section 1101, subdivision (b), it may be excluded under Evidence Code section 352 if its probative value is substantially outweighed by the probability its admission would unfairly prejudice the defendant, mislead the jury, or confuse the issues. (*People v. Balcom* (1994) 7 Cal.4th 414, 426-427; *People v. Abilez* (2007) 41 Cal.4th 472, 500.) In this context, "'prejudicial' is not synonymous with 'damaging.'" (*People v. Yu* (1983) 143 Cal.App.3d 358, 377.) "'"Prejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient…. "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues…. [T]he statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]"'" (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439, citations omitted.)

While defendant's inappropriately romantic behavior toward his mother and aunt certainly cast him in an unfavorable light, its probative value as evidence of motive outweighed the risk of undue prejudice to defendant. "'[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.) Here, it provided an explanation for why defendant would struggle with and harm his own female relative, inflicting a bite on her face and leaving her in a sexually exposed position. In addition, the evidence of defendant's inappropriate behavior "was no stronger and no more inflammatory" than the evidence of the murder. (*People v. Ewoldt, supra*, 7 Cal.4th at p. 405; see also *People v. Foster* (2010) 50 Cal.4th 1301, 1332 [claim that prior acts

17.

"'highly inflammatory'" rejected because "they were less inflammatory than the evidence in the present case"].)

In sum, the evidence was relevant, probative, not unduly prejudicial, and properly admitted. Accordingly, defense counsel had no duty to interject a meritless objection to this evidence. (*People v. Cudjo* (1993) 6 Cal.4th 585, 616 [no ineffective representation for failure to object where there is no sound basis for objection]; *People v. Majors* (1998) 18 Cal.4th 385, 403.) Defense counsel's representation did not fall below an objective standard of reasonableness under prevailing professional norms. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

## II.     Motion to Discharge Juror No. 4

Defendant argues that the trial court abused its discretion when it refused to discharge Juror No. 4 because she worked for the same business and on the same floor as Rita. Juror No. 4 did not recognize Rita's name during voir dire, but informed the court that she realized she worked with Rita as soon as she saw Rita's photograph during trial testimony. She did not know Rita and had no opinions about her or particular sympathy for her. She said having worked in the same place with Rita would not influence the way she would view the evidence. Although she had heard people at work talking about a coworker who was killed, possibly using Rita's name, Juror No. 4 did not "even know her." When she overheard this conversation, she did not gather or form any opinions that would influence her at trial. She did not think she would have any concerns while deliberating about how her decision might affect people at work or how they might view her verdict. She did not want to discuss the case after the verdict with people at work anyway.

Defense counsel moved to remove Juror No. 4, explaining that her statement that she did not want to tell her coworkers she was on the jury demonstrated that she would be

"affected by this knowledge." He said, "People don't want to come out and admit they could be unfair, but this is a flag of unfairness."

The prosecutor disagreed, arguing that Juror No. 4 did not even know Rita, and the reasons she would not want to talk about the case with coworkers were the gruesome nature of the photographs she had seen and the likelihood that her coworkers did not know exactly what had happened to Rita or how bad it really was.

The trial court stated:

"Okay. Well, I don't see any likelihood that this could have an impact on her decision making. This is somebody who works on the floor, who she didn't even notice was missing for some period of time, couldn't make the connection to her name as to the person that no longer worked there. The name didn't mean anything to her in voir dire. You know, … it's probably a good idea if we have a [photograph of the] decedent, for future purposes to put it on [the projector]. Anybody think you know this person? But I'm quite confident if she'd done that she'd have said the same thing. [']I didn't really know her, she looked familiar, seen her working on the floor, um, heard other people talking about it, didn't get any particular information.['] I wouldn't want to come back to work and let people know I was on a jury that involved a gruesome torture killing of one of their co-workers for the very reasons [the prosecutor has] already articulated; for them trying to get from me all the information they could have gotten at the trial, but really information that to preserve the dignity of the decedent is really not the kind of thing she'd share with her coworkers. Whether she'd want to talk to them or not is entirely up to her, but I just don't think there's any possibility at all that her having worked on the floor with this woman, this woman she didn't even notice was no longer there, this woman she didn't know by name and who she had, having seen her photo, apparently no real contact with, there's just no likelihood in my view that that's in any way gonna influence her decision. So I'll decline to remove her and you have a record."

Section 1089 provides: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, … the court may order the juror to be discharged …." "'Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown

19.

by the record to be a "demonstrable reality." The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence. [Citation.]' [Citations.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 807.) In making our determination, "[w]e defer to the trial court's judgment on [the juror's] credibility." (*People v. San Nicolas* (2004) 34 Cal.4th 614, 646; see also *People v. Beeler* (1995) 9 Cal.4th 953, 989 [recognizing the importance of a court's observation of a juror's demeanor in reviewing a decision to discharge], abrogated on another ground as recognized in *People v. Pearson* (2013) 56 Cal.4th 393, 462.) Here, we conclude that "[t]he record before us does not show that [Juror No. 4] was unable to fulfill her functions as a demonstrable reality. Accordingly, we find no abuse of discretion in the trial court's decision to retain the juror." (*People v. Jablonski, supra,* at p. 807.)

## III.   Abstract of Judgment

Lastly, defendant maintains that the abstract of judgment must be amended to reflect 1,640 (rather than 1, 140) total custody credits due to the time he spent confined to a mental hospital. The People agree. We shall order the abstract amended to reflect the proper number.

## **DISPOSITION**

The trial court is directed to correct the abstract of judgment to reflect 1,640 (rather than 1,140) total custody credits and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. The judgment is affirmed as modified.[11]

_____
                                                                    Kane, J.

WE CONCUR:


_____
Levy, Acting P.J.


_____
Franson, J.

---

[11] Documents in our record, including the probation officer's report, state that defendant is _six_ feet five inches tall, but photographs of defendant demonstrate this cannot be accurate, and they suggest he might instead be _five_ feet five inches tall. Moreover, a witness testified that defendant's height was between five feet four inches and five feet six inches. Defendant's actual height must be determined and verified in any official records describing his physical appearance.

21.